UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARGARET THURBER,

                 Plaintiff,

          v.

FINN ACADEMY: AN ELMIRA
CHARTER SCHOOL, and BOARD
OF TRUSTEES OF FINN ACADEMY:
AN ELMIRA CHARTER SCHOOL,

                 Defendants.

**DECISION AND ORDER**

6:20-CV-06152 EAW

---

## <u>INTRODUCTION</u>

Plaintiff Margaret Thurber ("Plaintiff") commenced this action arising from allegations that defendants Finn Academy: An Elmira Charter School (the "School") and the Board of Trustees of Finn Academy: An Elmira Charter School (the "Board") (collectively "Defendants") violated her constitutional rights and infringed her trademark in the name "Finn Academy."  (Dkt. 1).  Defendants counterclaimed for cancellation of the trademark.  (Dkt. 41).  Presently before the Court are Defendants' motion for summary judgment (Dkt. 78) and Plaintiff's motion for partial summary judgment (Dkt. 79).  For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part and Plaintiff's motion for partial summary judgment is denied.

# BACKGROUND

## I.    Factual Background

The following facts are taken from Plaintiff's Statement of Facts (Dkt. 79-70),
Defendants' Statement of Undisputed Facts (Dkt. 78), Defendants' Response to Plaintiff's
Statement of Material Facts (Dkt. 85-7), Plaintiff's Opposing Statement of Material Facts
(Dkt. 86-1), and the exhibits submitted by the parties.[1]  Unless otherwise noted, these facts
are undisputed.

The School is a not-for-profit education corporation organized pursuant to New
York State Education Law by grant of the State University of New York ("SUNY") Board
of Regents.  (Dkt. 78 at ¶ 1; Dkt. 79-70 at ¶ 1; Dkt. 85-7 at ¶ 1; Dkt. 86-1 at 2).  In March
of 2014, Plaintiff, together with Megan Townsend and Katelin Woods, responded to a
request for proposal ("RFP") and applied to the SUNY Charter Institute to operate the

---

[1]    The Court notes that this District's Local Rules of Civil Procedure require a party
moving for summary judgment to submit "a separate, short, and concise statement, in
numbered paragraphs, of the material facts as to which the moving party contends there is
no genuine issue to be tried."  Loc. R. Civ. P. 56(a)(1).  The opposing party must then
submit "a response to each numbered paragraph in the moving party's statement, in
correspondingly numbered paragraphs and, if necessary, additional paragraphs containing
a short and concise statement of additional material facts as to which it is contended there
exists a genuine issue to be tried."  *Id.* at 56(a)(2).  Here, Defendants' statement of facts is
31 pages long and contains 204 detailed paragraphs.  Plaintiff's response does not
separately correspond to Defendants' individual statements of fact and instead groups
certain facts together by topic and then provides her own separately numbered counter-
facts, which makes for a confusing document.  Taken together, these submissions undercut
the usefulness of the statement of facts.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74
(2d Cir. 2001) ("The purpose of Local Rule 56.1 [requiring a statement of facts] is to
streamline the consideration of summary judgment motions by freeing district courts from
the need to hunt through voluminous records without guidance from the parties.").
Nonetheless, the Court has considered the submissions but any future submissions that fail
to comply with the Court's Local Rules may be summarily rejected.

School in Elmira, New York.  (Dkt. 78 at ¶ 2; Dkt. 86-1 at 2).  Plaintiff signed the proposal as the lead applicant and declared that the information contained therein was true and accurate to the best of her knowledge.  (Dkt. 78 at ¶ 3; Dkt. 86-1 at 2).  The charter proposal stated that "[t]he concept for developing a charter school in the Elmira region originated with Maggie Thurber, Megan Townsend and Katelin Woods, the lead applicant and co-applicants of Finn Academy."  (Dkt. 78 at ¶ 5; Dkt. 78-8 at 42).  The proposal indicated that the School was named after the character Huckleberry Finn from the Mark Twain novel which was written in Elmira.  (Dkt. 78 at ¶ 8; Dkt. 79-70 at ¶ 4).  The School's founding Board of eleven individuals decided on the official name of Finn Academy (Dkt. 78 at ¶¶ 6, 7), but Plaintiff contends that she developed the concept and name (Dkt. 79-70 at 3, 5).  Plaintiff drafted some or all of the proposed curriculum that was submitted as part of the charter application.  (Dkt. 79-70 at ¶ 8; Dkt. 85-7 at ¶ 8).

A provisional charter document was executed on July 17, 2014, that incorporated the charter proposal and reflected that it was an agreement between the SUNY Board of Trustees and the School.  (Dkt. 78 at ¶¶ 9, 10; Dkt. 86-1 at 2; Dkt. 79-70 at ¶ 10; Dkt. 85-8 at ¶ 10).  The charter document provided that the SUNY Board of Regents would "approve the proposed charter, issue a provisional charter, and incorporate an education corporation to establish and operate the charter school."  (Dkt. 78 at ¶ 11; Dkt. 86-1 at 2).  SUNY authorized the School to operate under the name "Finn Academy: An Elmira Charter School."  (Dkt. 78 at ¶ 12; Dkt. 86-1 at ¶ 1).  Plaintiff did not have any ownership interest in the School and took no steps to stop the School from operating under that name.  (Dkt. 78 at ¶¶ 14, 15; Dkt. 78-2 at 30).  The approved charter provided for a board of

trustees which included two non-voting *ex officio* members, including a Head of School and elected representative of the parent body.  (Dkt. 79-70 at ¶ 11; Dkt. 85-7 at ¶ 11).  The charter was formed as of October 15, 2014.  (Dkt. 79-79 at ¶ 1; Dkt. 85-7 at ¶ 1).  The School opened in September of 2015 with Plaintiff as an *ex officio* trustee in the role of Head of School.  (Dkt. 78 at ¶¶ 16, 17; Dkt. 79-70 at ¶ 12; Dkt. 85-7 at ¶ 12; Dkt. 86-1 at 16).

Plaintiff's hiring was announced publicly with a statement indicating that the details of Plaintiff's contract were being negotiated and would be made public once finalized. (Dkt. 79-70 at ¶ 16; Dkt. 85-7 at ¶ 15).  Plaintiff was presented with a draft employment contract on October 8, 2014, but it was never signed by Plaintiff or Defendants.  (Dkt. 78 at ¶ 27; Dkt. 79-70 at ¶¶ 13, 18; Dkt. 85-7 at ¶¶ 13, 18; Dkt. 79-23).  The draft contract included rights to due process in connection with termination, as well as provisions relating to intellectual property.  (Dkt. 79-70 at ¶ 17; Dkt. 85-7 at ¶ 17; Dkt. 79-23).

The School's personnel policies provided that all employees were at will unless a written employment agreement was signed by the employee and approved by the Board. (Dkt. 78 at ¶ 20; Dkt. 78-10 at 11).  The personnel policies further provided:

> Employment for all employees at Finn Academy is employment at will. Employment at will may be terminated at the will of either the employer or the employee.  Employment and compensation may be terminated with or without cause and with or without notice at any time by you or the School. Other than the School's Head of School, no manager, supervisor, or representative of the School has any authority to enter into any agreement for employment with an employee for any specified period of time or to make any agreement for employment other than at will.  Only the School's Head of School has the authority to make any such agreement, and then only in writing and signed by the School's Head of School and the employee and approved by the Board of Trustees.

(Dkt. 78 at ¶ 21; Dkt. 78-10 at 11).

Plaintiff was provided with a wage document that provided:

Notwithstanding any other provision of this Agreement, the School shall be entitled to terminate the employment relationship at any time if in its sole discretion it believes that it is in the best interests of the School to do so, whereupon all liability of the School for the payment of any further salary, benefits, or any other payments shall cease and terminate. It is expressly understood by the parties that this Agreement is not intended to be a contract for any definite or specific length of time, and that their employment relationship is "at-will."

(Dkt. 78 at ¶ 25; Dkt. 78-11).

As Head of School, Plaintiff was responsible for overseeing the School's financially-responsible operation and ensuring that the fiscal policies were followed. (Dkt. 78 at ¶¶ 30, 32; Dkt. 86-1 at ¶ 50). One of Plaintiff's duties was overseeing the signing of checks to School vendors. (Dkt. 78 at ¶ 34; Dkt. 86-1 at ¶ 87).

The School was operating at a budgetary deficit and at times, vendors were not timely paid. (Dkt. 78 at ¶¶ 43, 54; Dkt. 86-1 at ¶¶ 56, 62). Martina Baker was the School's Chief Operations Officer as of July 11, 2016. (Dkt. 78 at ¶ 84; Dkt. 86-1 at 16; Dkt. 79-70 at ¶ 26). Ms. Baker signed at least one check that was not compliant with the School's fiscal policies. (Dkt. 78 at ¶ 88; Dkt. 79-70 at ¶ 27; Dkt. 79-70 at ¶ 27; Dkt. 86-1 at ¶ 86). When Plaintiff discovered in September 2016 that Ms. Baker had incorrectly signed a check to pay a vendor, Plaintiff reported it to a Board member on September 26, 2016, and on October 3, 2016, made a complaint about it to the Board during an executive session. (Dkt. 78 at ¶ 91; Dkt. 79-70 at ¶¶ 27, 29; Dkt. 86-1 at ¶ 91). Plaintiff also addressed the

issue directly with Ms. Baker as her supervisor and wrote a counseling memorandum to Ms. Baker.  (Dkt. 78 at ¶ 95; Dkt. 79-70 at ¶ 31; Dkt. 85-7 at ¶ 31; Dkt. 86-1 at ¶ 93).

Shortly thereafter on October 4, 2016, Ms. Baker submitted a written complaint about Plaintiff to the Board chair, stating:

> Since arriving as a staff member at Finn, I have found that the culture that is perpetuated by our Head of School is not what I thought it to be when I served as a Trustee; each day since I joined the staff I have had at least one staff member confide in me about the hostile and unprofessional environment that Mrs. Thurber has created here. In my humble opinion, it is antithetical to all that we aspired to create when crafting our charter a safe, high achievement culture based upon respect.

(Dkt. 78 at ¶¶ 99, 100; Dkt. 79-70 at ¶ 32; Dkt. 85-7 at ¶ 32; Dkt. 86-1 at ¶ 96).  The Board provided Plaintiff with a copy of Ms. Baker's complaint.  (Dkt. 78 at ¶ 102; Dkt. 86-1 at 16).

In light of Ms. Baker's complaint, the Board conducted an anonymous culture and climate survey of School staff, which was emailed to all School staff on October 30, 2016.  (Dkt. 78 at ¶¶ 104, 109, 110; Dkt. 79-70 at ¶ 33; Dkt. 85-7 at ¶ 33; Dkt. 86-1 at 16, ¶ 127).  Many of the responses were critical of Plaintiff and her leadership.  (Dkt. 78 at ¶¶ 116, 117, 118, 125; Dkt. 86-1 at ¶¶ 142, 143).

On November 22, 2016, Katelin Woods, the School's Director of Culture and Academics, submitted a written complaint about Plaintiff to the Board.  (Dkt. 78 at ¶ 126; Dkt. 86-1 at ¶ 107; Dkt. 78-21).  Ms. Woods described a meeting with Plaintiff where Plaintiff raised her voice in a manner that Ms. Woods considered to be "verbal abuse."  (Dkt. 78 at ¶ 128; Dkt. 78-21).  Ms. Woods also wrote:

It is my belief that Mrs. Thurber is abusing her leadership powers to mock, bully, and intimidate her staff members.  At this time, I do not feel safe being alone with Mrs. Thurber at all, for fear that she will treat me in the same disrespectful manner that she showed on November 19th.  I have a deep concern for the culture of our school, the mindset of our staff, and the comfort that our parents have to [sic] entrusted us with their children.  I have tried many times to make this environment work for myself, my colleagues, my scholars, and their families, but I can no longer stay silent regarding Mrs. Thurber and, in my opinion, the lack of respect that she demonstrates our organization and the people in it.

(Dkt. 78 at ¶ 129; Dkt. 78-21).  The Board met with Ms. Woods and discussed the complaint with Plaintiff.  (Dkt. 78 at ¶¶ 130, 131).

On December 4, 2016, Board Chair Jill Koski emailed Plaintiff with a list of corrective actions.  (Dkt. 78 at ¶ 133; Dkt. 86-1 at ¶ 155).  The Board met in an executive session on January 4, 2017, and Plaintiff was advised that she would be terminated.  (Dkt. 78 at ¶ 145; Dkt. 79-70 at ¶ 39; Dkt. 86-1 at ¶ 171).  On January 6, 2017, Plaintiff filed a formal complaint with the Board pursuant to New York State Education Law § 2855(4) and requested that her position be maintained.  (Dkt. 78 at ¶¶ 161, 163; Dkt. 86-1 at ¶ 219; Dkt. 79-48).  The Board responded to Plaintiff by letter dated February 21, 2017, denying her request to maintain her position.  (Dkt. 78 at ¶¶ 169, 170; Dkt. 86-1 at  35).

Plaintiff commenced this action on October 4, 2019, and included a claim for trademark and copyright infringement.   (Dkt. 78 at ¶¶ 174, 175; Dkt. 86-1 at 35).  Defendants made a motion to dismiss the claim in part because the mark was unregistered.  (Dkt. 78 at ¶ 178; Dkt. 86-1 at 35).  On May 13, 2020, Plaintiff opposed the motion to dismiss and on the same day, applied to the United States Patent and Trademark Office ("PTO" or "USPTO") for trademark registration of "Finn Academy" for use in providing

"educational services in the nature of charter schools."  (Dkt. 78 at ¶¶ 179, 180; Dkt. 86-1 at ¶ 220).  In the declaration supporting the application, Plaintiff represented that she was using the mark in commerce, but Plaintiff argues that "she made clear" to the PTO that the School was the only entity currently using the mark in commerce.  (Dkt. 78 at ¶ 185; Dkt. 86-1 at ¶¶ 222, 223).  On December 8, 2020, Plaintiff's application was approved by the PTO for the trademark "Finn Academy."  (Dkt. 78 at ¶ 195; Dkt. 86-1 at ¶ 227).

## II.    **Procedural Background**

Plaintiff commenced the instant action in New York State Supreme Court, Chemung County, on October 4, 2019, by filing a summons with notice.  (Dkt. 1 at ¶ 1).  Plaintiff filed the complaint on or about February 25, 2020.  (*Id*. at ¶ 5).  Defendants removed the matter to this Court on March 13, 2020, on the basis of federal question jurisdiction.  (Dkt. 1).  That same day, Defendants filed a motion to dismiss.  (Dkt. 2).  On March 11, 2021, the Court entered a Decision and Order granting in part and denying in part the motion to dismiss.  (Dkt. 10).  On April 1, 2021, Defendants filed an answer.  (Dkt. 13).  On February 2, 2022, Plaintiff was granted leave to file an amended complaint and on February 11, 2022, Plaintiff filed her amended complaint.  (Dkt. 40).  On February 25, 2022, Defendants filed their answer and counterclaim.  (Dkt. 41).

On June 21, 2024, Defendants filed their motion for summary judgment.  (Dkt. 78).  On August 23, 2024, Plaintiff filed a response (Dkt. 86), and on September 6, 2024, Defendants filed a reply (Dkt. 87).  Plaintiff also filed her motion for partial summary

judgment on June 21, 2024. (Dkt. 79). On August 23, 2024, Defendants filed their response (Dkt. 85), and on September 9, 2024, Plaintiff filed her reply (Dkt. 88; Dkt. 89).[2]

## DISCUSSION

## I. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (quotation marks, internal citations, and footnote omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[2]    The Court scheduled oral argument on these motions for February 13, 2025 (Dkt. 91), but Plaintiff's counsel requested (Dkt. 92) and was granted an adjournment of the argument in light of a recent change in counsel (Dkt. 94). The Court notified the parties that it would decide the motions on the papers. (Dkt. 94).

242, 247-248 (1986) (emphasis in original).  Where, as here, there are cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## II.   <u>First Amendment Retaliation Claim</u>

Plaintiff's First Amendment retaliation claim is brought pursuant to 42 U.S.C. § 1983.  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).  "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).[3]

To state a plausible claim for First Amendment retaliation, a plaintiff must allege: "(1) his speech or conduct was protected by the First Amendment; (2) [defendants] took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Persaud v. City of New York*, No. 1:22-CV-02919 (MKV), 2023 WL 2664078, at *4 (S.D.N.Y. Mar. 28, 2023) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)); *see also Searle v. Red Creek*

---

[3]     The School and the Board do not dispute that they are municipal entities and state actors for purposes of § 1983.

*Cent. Sch. Dist.*, No. 21-CV-6086-FPG, 2021 WL 5086405, at *4 (W.D.N.Y. Nov. 2, 2021)

("The elements of a First Amendment retaliation claim are dependent on the 'factual

context' of the case." (quotation and citation omitted)).

As to the first element, the Supreme Court in *Lane v. Franks*, 573 U.S. 228 (2014),

outlined a two-step inquiry into whether a public employee's speech is entitled to

protection:

> The first [step] requires determining whether the employee spoke as a citizen
> on a matter of public concern. If the answer is no, the employee has no First
> Amendment cause of action based on his or her employer's reaction to the
> speech. If the answer is yes, then the possibility of a First Amendment claim
> arises. The question becomes whether the relevant government entity had an
> adequate justification for treating the employee differently from any other
> member of the general public.

*Id.* at 237 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see also Shara v.*

*Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82-83 (2d Cir. 2022) ("So in assessing the

first prong of the retaliation test–whether a public employee's speech is protected–we must

consider 'two separate subquestions': (1) whether the employee spoke as a citizen rather

than solely as an employee, and (2) whether he spoke on a matter of public concern. . . . If

either question is answered in the negative, our inquiry may end there. If both questions

are answered in the affirmative, we may proceed to consider whether the employer had an

adequate justification for treating the employee differently from any other member of the

general public based on the government's needs as an employer." (citations and quotations

omitted)); *DiFonzo v. Cnty. of Niagara*, No. 1:22-CV-588, 2023 WL 1801695, at *5

(W.D.N.Y. Feb. 7, 2023) ("A public employee's speech 'is protected by the First

Amendment only when the employee is speaking as a citizen . . . on a matter of public

concern.'" (quoting *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012)) (internal quotation marks omitted)).

"The Second Circuit has identified "two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether the speech fall[s] outside of the employee's official responsibilities, and (2) whether a civilian analogue [(*i.e.*, a form or channel of discourse available to non-employee citizens)] exist[s]." *Lopez v. Falco*, No. 23-CV-10420 (KMK), 2024 WL 4252561, at *12 (S.D.N.Y. Sept. 19, 2024) (quoting *Montero v. City of Yonkers, New York*, 890 F.3d 386, 397 (2d Cir. 2018)). "Although the second issue 'may be of some help in determining whether one spoke as a citizen, it is not dispositive—the first inquiry is the critical one." *Id.* (quoting *Montero*, 890 F.3d at 397-98). To assess whether a public employee is speaking pursuant to official duties, courts "examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two," in addition to other contextual factors such as whether the plaintiff's speech "was also conveyed to the public." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012); *see also Severin v. New York City Dep't of Educ.*, No. 19-CV-775 (MKV), 2023 WL 2752973, at *7 (S.D.N.Y. Mar. 31, 2023) ("In determining whether an employee spoke pursuant to his official duties, a key question is whether the complaint was part-and-parcel of his concerns about his ability to properly execute his duties." (citations and quotations omitted)), *aff'd*, No. 23-732-CV, 2024 WL 1904574 (2d Cir. May 1, 2024).

Plaintiff's First Amendment retaliation claim arises from her reporting of Ms. Baker's alleged breach of the School's fiscal policy. Specifically, after discovering Ms. Baker had signed checks in violation of the fiscal portion of the School's by-laws, Plaintiff

informed Renee Sutton, a Board member who chaired the School's finance committee. Plaintiff also attended a Board meeting to discuss the matter. Following the meeting, Plaintiff authored a counseling memorandum to Ms. Baker explaining her role and the policies required to be followed. Plaintiff contends that these reports and discussions concerning Ms. Baker's unauthorized signing of checks was protected speech because it related to a matter of public concern and was made as a citizen.

Even assuming that the speech related to a matter of public concern, *see Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) ("[A] topic is a matter of public concern for First Amendment purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech." (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004))), Plaintiff's statements do not qualify as constitutionally protected speech because there is no evidence to support a conclusion that at the time the statements were made, Plaintiff was speaking as a private citizen, and not solely as an employee. Indeed, Plaintiff acknowledges that ensuring adherence to fiscal policy was her responsibility as Head of School. When asked at her deposition if fiscal oversight "was one of [her] job obligations as head of school," she responded, "Fiscal oversight, yes, in concert with the board of trustees. That is not a single, I mean, I can do nothing that the board doesn't approve." (Dkt. 78-2 at 55).[4] To now suggest that Plaintiff speaking to the Board and Ms. Baker about fiscal policy concerns was somehow outside of her

---

[4]    Indeed, Plaintiff's amended complaint specifically alleges that "PLAINTIFF'S reporting of financial improprieties by BAKER were made by PLAINTIFF in good faith, and in furtherance of her administrative and fiduciary duties as Head of School and Trustee *ex officio*." (Dkt. 40 at ¶ 84).

employment is unconvincing. *See Shara*, 46 F.4th at 80 (bus driver's disagreements with school district mechanic and school district officials over the frequency of bus inspection reporting did not constitute protected speech, regardless of whether the information impacted the safety of school children); *Barclay v. Michalsky*, 368 F. App'x 266, 267 (2d Cir. 2010) (complaints to supervisors that co-workers were mistreating patients and sleeping on the job was part of job duties and not speech as public citizen); *Catania v. United Fed. of Teachers*, No. 1:21-CV-1257-GHW, 2025 WL 638625, at *8 (S.D.N.Y. Feb. 27, 2025) ("Rather, she was speaking directly to a teacher, who she supervises as a principal, on that individual teacher's inadequate lesson plan. This conduct falls squarely in the category of speech 'execut[ing] one of her core duties' as principal." (quoting *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.,* 593 F.3d 196, 201 (2d Cir. 2010))); *Johnson v. Bd. of Educ. Ret. Sys. of City of New York,* No. 18CV4605(NGG)(PK), 2021 WL 2133434, at *6 (E.D.N.Y. May 11, 2021) ("Because he was reporting on a core job function within an established internal channel of communication, Johnson was not speaking as a citizen and his speech is not protected by the First Amendment."), *aff'd*, No. 21-1465-CV, 2022 WL 17076718 (2d Cir. Nov. 18, 2022); *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 208-09 (E.D.N.Y. 2009) ("'[P]ublic employees who convey complaints or grievances about a matter pertaining to their official duties to their supervisors do so in their capacities as employees rather than citizens, even when the subject matter of their speech touches upon a matter of public concern,' and therefore, such speech is not protected by the First Amendment." (quoting *Weintraub*, 489 F.Supp.2d at 221)).

There being no credible admissible evidence before the Court showing that Plaintiff's speech concerned matters outside the scope of her job duties or demonstrating the presence of any factual issues on that point, Plaintiff's statements about Ms. Baker's conduct cannot be considered to have been protected speech made as a citizen. As a result, the Court need not reach the question of causation. Accordingly, Defendants' motion for summary judgment as to this claim is granted.

## III.    <u>Procedural Due Process</u>

Plaintiff's due process claim arises pursuant to § 1983 and the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment was "intended to secure the individual from the arbitrary exercise of the powers of government . . . [and] serves to prevent governmental power from being used for purposes of oppression." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (quotations and citations omitted). To succeed on a due process claim, a plaintiff must establish that "he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ v. Loudermill*, 470 U.S. 532, 542 (1985) (quotation omitted).

"To evaluate whether a plaintiff received due process, one of two standards may apply. If the deprivation is the result of 'unauthorized acts by state employees,' the Fourteenth Amendment is not violated 'so long as the State provides a meaningful post-deprivation remedy.' If the deprivation 'occurs in the more structured environment of

established State procedures, rather than random acts, the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process.'"  *Langton v. Town of Chester*, 168 F. Supp. 3d 597, 606 (S.D.N.Y. 2016) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 880 (2d Cir. 1996)).  Instead, in such cases, the Court considers the adequacy of the pre-deprivation procedures, taking into account:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).  "The distinction between random and unauthorized conduct and established state procedures, however, is not clear-cut." *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 465-66 (2d Cir. 2006). The Second Circuit has held that "the acts of high-ranking officials who are 'ultimate decision-maker[s]' and have 'final authority over significant matters,' even if those acts are contrary to law, should not be considered 'random and unauthorized' conduct for purposes of a procedural due process analysis."  *Id.* (quoting *Velez v. Levy*, 401 F.3d 75, 91-92 & n. 14 & 15 (2d Cir. 2005)).

Plaintiff argues that she had an enforceable expectation of continued employment which constituted a property interest, such that she could not be terminated without the due process protections of notice and hearing.  However, resolution of whether Plaintiff had a

property interest in her continued employment is precluded on these motions by the existence of factual disputes over Plaintiff's employment status.

Defendants contend that Plaintiff was an at will employee with no protected property interest in her employment. *Baron v. Port Auth. of N.Y. & N.J.*, 271 F.3d 81, 85, 89 (2d Cir. 2001) ("Plaintiffs' procedural due process claims fail because at-will employment is not a constitutionally protected property interest. Thus, procedural due process protections are not triggered."); *Catania v. United Fed'n of Tchrs.*, No. 1:21-CV-1257-GHW, 2024 WL 495638, at *8 (S.D.N.Y. Feb. 8, 2024) ("Employees at will have no protectable property interest in their continued employment," and will only "possess a protected interest in public employment if contractual or statutory provisions guarantee continued employment absent sufficient cause for discharge or he can prove a de facto system of tenure." (quoting *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002))). In support of this argument, Defendants rely on language in the School's charter policies that provide "[e]mployment for all employees at Finn Academy is employment at will" and that "employment and compensation may be terminated with or without cause and with or without notice at any time by you or the School." (Dkt. 78-10 at 11). The charter policy provides that any agreement "for employment other than at will" must be "in writing and signed by the School's Head of School and the employee and approved by the Board of Trustees" (*id.*), and it is undisputed that Plaintiff's draft employment agreement was unsigned. Defendants argue that as an at will employee, Plaintiff received all the process she was due.

Conversely, Plaintiff contends that she was not an at will employee pursuant to the School by-laws applicable to removal of trustees (*see* Dkt. 79-15 at 2 (providing for removal of trustees for cause)) and New York Education Law § 226(8), which governs the process to which she was due. New York Education Law § 226 provides that the Board may "[r]emove or suspend from office by vote of a majority of the entire board any *trustee*, officer or *employee engaged under special contract*, on examination and due proof of the truth of a written complaint by any trustee, of misconduct, incapacity or neglect of duty; provided, that at least one week's previous notice of the proposed action shall have been given to the accused and to each trustee." N.Y. Educ. Law § 226(8) (emphasis added). Plaintiff contends that this statute applies to her as a both a "trustee" and as an "employee engaged under special contract."

As to Plaintiff's first point, she contends that because it is undisputed that she was an *ex officio* trustee, the language of the School by-laws and Education Law applicable to trustees is equally applicable to her. She relies in part on this Court's prior determination addressing whether service on an *ex officio* Board member was sufficient to constitute service on the Board. *See Thurber v. Finn Acad.*, No. 6:20-CV-06152 EAW, 2021 WL 927627, at *3 (W.D.N.Y. Mar. 11, 2021) ("Moreover, there is precedent in New York law for treating *ex officio* members as board members for legal purposes. For example, the New York Court of Appeals has held that the presence of three *ex officio* members and a lay trustee was sufficient to constitute a quorum of the board of trustees of a religious corporation. *Blaudziunas v. Egan*, 18 N.Y.3d 275, 279 (2011). The Court finds no basis to conclude that the phrase 'any one of the members' as used in CPLR 312 excludes *ex*

*officio* members.").  Neither party has identified conclusive legal authority on this issue. At the very least, there are factual questions as to whether Plaintiff's title of *ex officio* trustee in this instance was a mere formality without substance or whether it amounted to a position warranting the application of protections greater than those afforded to at will employees.

Alternatively, Plaintiff argues that the Education Law provisions are applicable to her as an employee engaged under special contract.  She contends that her acceptance of the Head of School position was in reliance on multiple promises that she would receive an employment contract.  She cites to an October 20, 2014 news story wherein the Board chairwoman was quoted saying that the details of Plaintiff's employment contract were being negotiated and would be made public once finalized.  (*See* Dkt. 79-22).  Plaintiff also points to the employment contract draft that was provided to her on October 8, 2014, as evidence that she was under a clearly implied promise of continued employment and the draft contract expressly provides due process protection.[5]  Additionally, she notes that

---

[5]    Specifically, the draft employment agreement provides:

**SECTION 3.03 TERMINATION FOR JUST CAUSE.**  Finn Academy shall have the right to terminate EMPLOYEE'S employment hereunder for Cause.  For purposes hereof, "Cause" shall be defined as the Board's good faith determination that the EMPLOYEE has: (i) been convicted of or entered a plea of nolo contendere with respect to a criminal offense constituting a felony; (ii) committed one or more acts or omissions constituting fraud, embezzlement or breach of a fiduciary duty to FINN ACADEMY; (iii) committed one or more acts constituting gross negligence or willful misconduct; (iv) habitually abused alcohol or any controlled substance or reported to work under the influence of alcohol or any controlled substance (other than a controlled substance which EMPLOYEE is properly taking under a current prescription), (v) engaged in harassment of any employee,

during a School audit in 2016, the auditors requested and were provided with a copy of Plaintiff's draft employment agreement, notwithstanding that it was unsigned and not finalized.  Plaintiff contends that all of these circumstances in total constitute a sufficient basis for the Court to conclude as a matter of law that she was employed pursuant to an employment contract.

---

scholar, or customer of FINN ACADEMY in violation of FINN ACADEMY policy; (vii) [sic] committed a material violation of any FINN ACADEMY policy; (viii) been insubordinate or dishonest; (ix) engaged in self-dealing or in any act constituting a conflict of interest; (ix) exposed FINN ACADEMY to criminal liability through negligence or wrongdoing of any kind; (x) disclosed FINN ACADEMY's confidential information in violation of her obligations under this Agreement or the Charter Agreement; (xi) failed, after written warning specifying in reasonable detail the breach(es) complained of, to substantially perform her duties under this Agreement; or (xii) committed an act of moral turpitude or exhibited any other behavior that significantly impairs the reputation of FINN ACADEMY.

**SECTION 3.04 PROCEDURE FOR TERMINATION FOR JUST CAUSE.** A termination of the EMPLOYEE'S employment for Cause shall be effected in accordance with the following procedures.  Prior to the termination of this agreement for Just Cause, the EMPLOYEE shall be given a statement setting forth the cause for termination and the EMPLOYEE shall be entitled to a hearing before the Board of Trustees concerning such termination.  After such hearing the Trustees shall inform the EMPLOYEE of their decision following her receipt of written notice of such adverse finding to seek review of the Trustees decision through Arbitration proceedings as specified in ARTICLE V herein. Failure to seek review within the time provided shall be deemed a waiver by the EMPLOYEE of any rights to contest the decision of the Trustees, which shall thereupon become final and the EMPLOYEE shall have no further claim or recourse. Pending any review of a decision by the Trustees to terminate this agreement for cause, the Trustees may suspend the EMPLOYEE from all duties as Head of School, but with no change in compensation, reimbursements and benefits. Once the decision to terminate this agreement becomes final, all compensation and benefits provided for herein shall terminate immediately.

(Dkt. 79-23 at 7-8).

To the contrary, these circumstances demonstrate that there are disputed factual issues as to whether Plaintiff is entitled to the protections of an implied contract that may not be resolved on summary judgment motions. *See Skelly v. Visiting Nurse Ass'n of Cap. Region Inc.*, 210 A.D.2d 683, 685 (3d Dep't 1994) ("Considering the totality of the circumstances in this case, we are of the view that defendants are not entitled to summary judgment dismissing plaintiff's wrongful discharge cause of action. In particular, we conclude that the oral assurances made by VNA's Executive Director during the parties' antecedent negotiations, together with the written personnel and procedure manuals provided to plaintiff with the offer of employment, raise a question of fact as to whether VNA limited by express agreement its authority to terminate plaintiff's employment at will."); *Dicocco v. Cap. Area Cmty. Health Plan, Inc.*, 135 A.D.2d 308, 310-11 (3d Dep't 1988) ("While the absence of a written contract generally gives rise to a presumption of an at-will employment, terminable by either party without cause . . . such presumption can be overcome by establishing an implied employment contract. . . . Considering all of the circumstances, the issue of whether there was an implied employment contract and, if so, whether it was breached, should be determined at trial and not at this procedural juncture."); *see also Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (holding that teacher had property interest in continued employment based on a de facto tenure system derived in part from college's faculty guide and statewide tenure guidelines); *Gallegos v. Top RX, Inc.*, No. 04-CV-773A, 2008 WL 4279526, at *1 (W.D.N.Y. Sept. 15, 2008) ("The fact that no single document encompasses all of the terms of the plaintiff's employment is inconsequential. Under New York law, even an oral employment contract can act as a

binding agreement between the parties. . . .  It is the parties' intentions that determine whether a valid contract existed. . . .  Given the fact that plaintiff worked for the defendants for 13 years, the jury could certainly infer that the parties intended to create (and in fact did create) an employment agreement." (citations omitted)).

As is clear, there are genuine issues of material act as to whether Plaintiff was an at will employee or could only be terminated for cause.  Because these disputed issues as to Plaintiff's employment status necessarily dictate whether she possessed a property interest in her employment, the Court cannot resolve the question of whether her due process rights were violated at this juncture.  *See Reynolds v. Vill. of Chittenango*, No. 5:19-CV-416 (GLS/ML), 2023 WL 6460417, at *8 (N.D.N.Y. Oct. 4, 2023) ("In other words, essential to the analysis of Reynolds' Fourteenth Amendment claim is a determination of whether he was a probationary employee at the time he was terminated.  The answer to this question—whether Reynolds was probationary—adjudges whether process was, in fact, due.  However, the parties dispute a multitude of material facts, leaving this determination unresolved—and, for summary judgment purposes, unresolvable."); *Morgenstern v. Cnty. of Nassau*, No. 04-CV-0058 JS ARL, 2008 WL 4449335, at *19 (E.D.N.Y. Sept. 29, 2008) ("Because the Court has already found that there is an issue of fact as to whether Plaintiff was a permanent employee at the time of her termination, the Court cannot grant summary judgment for Defendants on this [due process] claim."); *Jackson v. Kemp*, No. 88 CIV. 2919 (LLS), 1991 WL 39300, at *1 (S.D.N.Y. Jan. 22, 1991) ("In addition, the degree to which such administrative procedures apply to plaintiff apparently depends upon resolution

of factual issues concerning whether she was a 'probationary' or an 'excepted' or a 'full' employee.  Accordingly, plaintiff's motion is also denied.").

In addition to disputing Plaintiff's property interest in her employment, Defendants contend that Plaintiff's due process claim is barred because the appropriate forum for a challenge to her termination on the basis that Defendants failed to follow New York State procedures is an Article 78 proceeding.  Were Plaintiff's claim grounded solely on a violation of New York state procedures, the Court would agree.  It is "well settled that proceedings that compel action by a government agency or challenge the reasonableness or legality of an administrative decision must be brought in Supreme Court as an article 78 proceeding."  *Spillers v. City of New York*, 58 Misc. 3d 150(A), 94 N.Y.S.3d 540 (Kings Cty. 2018); *see also Finley v. Giacobbe*, 79 F.3d 1285, 1292 (2d Cir. 1996) ("Even non-tenured or probationary employees must invoke article 78 to review dismissals that are allegedly arbitrary, capricious, or prohibited by statute or the constitution."); *Trask v. Town of Alma*, No. 1:19-CV-01192, 2020 WL 6390091, at *4 (W.D.N.Y. Oct. 30, 2020) ("In New York, Article 78 proceedings are the 'exclusive remedy for a discharged public employee, who must seek reinstatement prior to seeking unpaid salary[.]'" (quotation and citation omitted)); *Vill. of Northport v. Krumholz*, 169 A.D.3d 745, 746 (2d Dep't 2019) ("We agree with the Supreme Court's determination that the defendant [challenging termination pursuant to Public Officer Law § 36] was required to bring a proceeding pursuant to CPLR article 78 to pursue her claim of wrongful termination and to seek reinstatement and unpaid salary."); *Walsh v. New York State Thruway Auth.*, 24 A.D.3d 755, 756-57 (2d Dep't 2005) (claim that a plaintiff was terminated without hearing in

violation of state law rights and sought reinstatement was "clearly within the purview of a CPLR article 78 proceeding, the proper procedural vehicle for reviewing such a termination").

But the availability of Article 78 proceedings does not automatically foreclose a party's ability to pursue due process claims in federal court. While there are some circumstances for which the availability of Article 78 proceedings can bar a federal due process claim, *see McCluskey v. Lopez*, No. 24-381, 2024 WL 5182876, at *2 (2d Cir. Dec. 20, 2024) ("[U]nder some circumstances, the Supreme Court has said it is possible that 'a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process.'" (quoting *Zinermon v. Burch*, 494 U.S. 113, 127-28 (1990))); *Locurto v. Safir*, 264 F.3d 154, 175 (2d Cir. 2001) ("An Article 78 proceeding therefore constitutes a wholly adequate post-deprivation hearing for due process purposes."); *Nolan v. Cnty. of Erie*, No. 1:19-CV-01245, 2020 WL 1969329, at *11 n.7 (W.D.N.Y. Apr. 24, 2020) ("Article 78 proceedings often constitute sufficient procedural due process foreclosing a § 1983 claim against municipalities."), whether or not the due process claims are wholly precluded may vary depending on the context. In other words, "[s]ufficient process 'is a flexible concept that varies with the particular situation,' considering factors that include the private interest affected, the risk of a wrongful deprivation of such interest under the procedures used, the probable value of additional or substitute procedural safeguards, and the burdens to the government that additional procedural protections might entail." *McCluskey*, 2024 WL 5182876, at *2.

Here, Plaintiff contends that she did not receive pre-deprivation or post-deprivation procedures to which she was entitled, her right to which turns on a determination of her employment status. *See Todaro v. Norat,* 112 F.3d 598, 599-600 (2d Cir. 1997) (where a tenured employee has a right to notice and opportunity to be heard before termination, "certain features must be present to fulfill the minimum requirements of fairness" and post-termination proceedings do not satisfy those requirements); *Moulton v. Cnty. of Tioga, New York*, No. 3:22-CV-00340 (AMN/ML), 2024 WL 4836608, at *10 (N.D.N.Y. Nov. 20, 2024) (denying motion for summary judgment on procedural due process claim where "a reasonable juror could very well find that a pre-deprivation hearing was required"); *Reynolds v. Vill. of Chittenango*, No. 519CV416(GLS/TWD), 2020 WL 1322509, at *6 (N.D.N.Y. Mar. 20, 2020) ("Here, Reynolds[] alleges that defendants did not provide him with the pre-termination notice and hearing that was required under law and contract. Accordingly, the availability of an Article 78 proceeding does not foreclose his procedural due process claim."); *Mullen v. Vill. of Painted Post*, 356 F. Supp. 3d 275, 282 (W.D.N.Y. 2019) (because plaintiff alleged he was not provided a meaningful pre-termination opportunity to respond, "a post-deprivation procedural safeguard such as an Article 78 proceeding does not automatically satisfy due process"); *Swain v. Town of Wappinger*, No. 17 CIV. 5420 (JCM), 2019 WL 2994501, at *8 (S.D.N.Y. July 9, 2019) (denying cross-motions for summary judgment and rejecting argument that Article 78 post-deprivation remedies defeat Plaintiff's due process claim because "the availability of an adequate post-termination remedy, whether through a CBA procedure or Article 78 hearing, does not satisfy due process if there was no pre-termination notice"). Because of the factual disputes

- 25 -

underpinning the question of Plaintiff's employment status, the Court cannot determine on these motions whether Article 78 provided Plaintiff adequate and exclusive relief for her due process claims.

Finally, Defendants argue that alternatively, Plaintiff has failed to state a "stigma-plus" due process claim for deprivation of a liberty interest in her reputation. "To state a claim for a stigma-plus due process violation, 'the plaintiff must plausibly plead the existence of a stigmatizing statement that is coupled with the loss of governmental employment or deprivation of a legal right or status, such as loss of job opportunities.'" *Karam v. Utica City Sch. Dist.*, No. 6:23-CV-0020 (GTS/MJK), 2025 WL 641636, at *18 (N.D.N.Y. Feb. 27, 2025) (quoting *Walker v. Fitzpatrick*, 814 F. App'x 620, 624 (2d Cir. 2020)(internal quotation marks omitted)). "Such a claim is referred to as a 'stigma-plus' claim because 'it involves an injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus), without adequate process.'" *Balchan v. New Rochelle City Sch. Dist.*, No. 23-CV-06202 (PMH), 2024 WL 2058726, at *8 (S.D.N.Y. May 7, 2024) (quoting *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006)).

To adequately establish the "stigma" component of a stigma-plus claim arising from a termination from public employment, a plaintiff must establish three elements: "*First*, the plaintiff must . . . show that the government made stigmatizing statements about [her]—statements that call into question [the] plaintiff's good name, reputation, honor, or integrity. . . . *Second*, a plaintiff must prove these stigmatizing statements were made public. *Third*, the plaintiff must show that the stigmatizing statements were made concurrently with, or

in close temporal relationship to, the plaintiff's dismissal from government employment."
*Segal*, 459 F.3d at 212; *Walker*, 814 F. App'x at 624 ("An actionable stigmatizing statement is one that 'call[s] into question plaintiff's good name, reputation, honor, or integrity.  Statements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession may also fulfill this requirement.'" (quoting *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004))).

Defendants first argue that Plaintiff's stigma-plus claim fails because she had an adequate post-deprivation remedy.  To be sure, for at will employees, the availability of an Article 78 name-clearing hearing will defeat a stigma-plus claim.  *See Segal,* 459 F.3d at 214 ("We now hold that, in this case involving an at-will government employee, the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim. . . ."); *Catania v. United Fed. of Teachers*, No. 1:21-CV-1257-GHW, 2025 WL 638625, at *13 (S.D.N.Y. Feb. 27, 2025) (no deprivation of due process for at will employee who had opportunity to obtain an Article 78 name-clearing hearing, regardless of whether the process was pursued).  But as set forth above, issues of fact prevent resolution of whether Plaintiff was an at will employee and therefore, the cases relied upon by Defendants do not resolve the issue of whether Plaintiff may pursue a stigma-plus claim.

Alternatively, Defendants argue that Plaintiff's stigma-plus claim fails because Plaintiff cannot establish that any false statements injurious to her reputation were publicized by Defendants. On this point, the Court agrees.

While somewhat difficult to discern, it appears that Plaintiff's stigma-plus claim relies on the official complaint made by Ms. Baker to the Chair of the Governance Committee of the Board about Plaintiff, the statements received by Board staff in response to the anonymous survey, notes from follow up interviews, emails among Board members, and the Board response to Plaintiff's January 2017 complaint which was provided to the executive director of the SUNY Charter Institute. Plaintiff contends that these statements were highly and unfairly critical and impugned Plaintiff's ability and professionalism. Even assuming that the statements are sufficient to support such a claim, *Hanley v. New York City Health & Hosps. Corp.*, 722 F. Supp. 3d 112, 126 (E.D.N.Y. 2024) ("Statements that 'an employee merely performed a job poorly or acted in an improper manner [are] not sufficient." (quoting *Dingle v. City of New York*, 728 F. Supp. 2d 332, 346 (S.D.N.Y. 2010))), Plaintiff has not established that the statements were made public, as required.

"To establish the second element, that the stigmatizing statements were made public, Plaintiff[s] must [show] that there had been any dissemination of [D]efendants' stigmatizing statements sufficient to affect [P]laintiffs' standing in the community or to foreclose future job opportunities." *Barzilay v. City of New York*, 610 F. Supp. 3d 544, 610 (S.D.N.Y. 2022) (quoting *Twardosz v. Yonkers Pub. Sch. Dist.*, 2020 WL 6135114, at *4 (S.D.N.Y. Oct. 16, 2020) (internal quotation marks omitted)). This element does not require that the dissemination occur in a public forum such as at a Board meeting or press

conference; indeed, even inclusion in a personnel file can be deemed sufficient in some cases. *Brandt v. Bd. of Co-op. Educ. Servs., Third Supervisory Dist., Suffolk Cnty., N.Y.*, 820 F.2d 41, 45 (2d Cir. 1987) ("If Brandt is able to show that prospective employers are likely to gain access to his personnel file and decide not to hire him, then the presence of the charges in his file has a damaging effect on his future job opportunities."); *see Barrer-Cohen v. Greenburgh Cent. Sch. Dist.*, No. 18 CIV. 1847 (NSR), 2019 WL 3456679, at *7 (S.D.N.Y. July 30, 2019) ("The second requirement of public disclosure was met when Defendant placed the Counseling Letter into Plaintiff's personnel file."). Here, Defendants contend that the Board "took great pains to ensure that the reasons for Plaintiff's termination were not disseminated publicly" (Dkt. 78-43 at 25), and Plaintiff has not identified *any* evidence that contradicts that point or reflects any public sharing of the alleged stigmatizing statements—or even potential public sharing of the statements. This is fatal to her stigma-plus claim. On this record, no reasonable jury could find in favor of Plaintiff on her stigma-plus claim. *See Walker*, 814 F. App'x at 624 ("Walker next alleges that an August 8, 2014 confidential letter from Klein to Walker's counsel regarding the administrative decision not assign Walker to criminal cases is an actionable stigmatizing statement. However, Walker did not plead that this letter was made public. Walker also did not allege that the letter became part of her personnel file, or that prospective employers would have access to the letter, or any other way in which the letter plausibly can be seen as a public statement."); *Barzilay,* 610 F. Supp. 3d at 611 ("But here, Plaintiffs have adduced no evidence that suggests that the information submitted to the [City Department of Investigation] would be disclosed to a potential employer or would otherwise be

'disseminated widely enough to damage the . . . employee's standing in the community or foreclose future job opportunities.'" (quoting *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1063 (2d Cir. 1993)); *Wang v. Bethlehem Cent. Sch. Dist.*, No. 121CV1023(LEK/DJS), 2022 WL 3154142, at *28 (N.D.N.Y. Aug. 8, 2022) ("[Superintendent's] statement in a letter to the Commissioner [of Education] is not sufficiently public to meet the stigma plus test absent any allegations that the statement spread further or was available to the public."). For these reasons, the Court grants summary judgment for Defendants as to Plaintiff's stigma-plus due process claim and denies Plaintiff's motion for summary judgment on this claim.

Accordingly, as set forth above, issues of fact preclude a determination as to the nature of the process due Plaintiff and whether the availability of Article 78 proceedings may ultimately preclude Plaintiff's due process claim. Both parties' motions for summary judgment on that portion of Plaintiff's due process claims are denied. However, as to Plaintiff's stigma-plus claim, Defendants' motion is granted and Plaintiff's motion is denied.

## IV. <u>Trademark Infringement and Cancellation of the Trademark</u>

To state a viable claim for trademark infringement of registered trademarks under the Lanham Act, a plaintiff must allege that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale . . . or advertising of goods and services,' . . . (5) without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc*., 414 F.3d 400, 407 (2d Cir. 2005) (internal citation omitted). "In addition, the plaintiff must show

that defendant's use of that mark is likely to cause confusion . . . as to the affiliation,

connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship,

or approval of [the defendant's] goods, services, or commercial activities by [plaintiff]."

*Id.* (quotation and citation omitted).  The elements of a trademark infringement claim under

New York common law are comparable.  *See Gen. Petroleum GmbH v. Stanley Oil &*

*Lubricants, Inc., No.* 2:24-CV-02324-NRM-LGD, 2024 WL 4143535, at *8 (E.D.N.Y.

Sept. 11, 2024) ("Under both the Lanham Act and New York common law, a plaintiff

demonstrates a 'likelihood of success on the merits of a trademark infringement or unfair

competition claim by showing both [(1)] a legal, exclusive right to the mark, and [(2)] a

likelihood that customers will be confused as to the source of the infringing product.'"

(quoting *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 43 (2d Cir. 2020))

(internal quotation marks omitted)); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc*., 378

F. Supp. 2d 448, 456 (S.D.N.Y. 2005) ("It is well-established that the elements necessary

to prevail on causes of action for trademark infringement and unfair competition under

New York common law mirror the Lanham Act claims.").

### A.    Validity of the Trademark

"To qualify for trademark registration, a mark must be either (1) inherently

distinctive, where its intrinsic nature serves to identify its particular source; or (2)

distinctive by virtue of having acquired a secondary meaning in the minds of consumers."

*Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 302 (E.D.N.Y. 2014) (quotations and

alteration omitted).  "A certificate of registration with the PTO is *prima facie* evidence that

the mark is registered and valid (*i.e*., protectible), that the registrant owns the mark, and

that the registrant has the exclusive right to use the mark in commerce." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *Crye Precision LLC v. Concealed Carrier, LLC*, No. 23-CV-4469(EK)(LKE), 2024 WL 4225482, at *7 (E.D.N.Y. Sept. 17, 2024) ("Federal registration of a trademark is prima facie evidence of the validity of the registered mark, as well as the registrant's ownership and exclusive right to use the mark." (quotation and citation omitted)).  "In order to rebut the presumption of validity, the allegedly infringing party must show, by a preponderance of the evidence that the mark is ineligible for protection." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F. 3d 206, 217 n.10 (2d Cir. 2012).  A "registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993).

Here, it is undisputed that the PTO registered the trademark for Finn Academy on the principal register on December 8, 2020, without requiring additional proof of secondary meaning.  Defendants contend that notwithstanding the mark registration, their rights to use the mark are not extinguished because Plaintiff has never used it in commerce and Defendants are the senior users.  The Court agrees.

"In order to maintain a prior use defense, the defendant must prove '(1) present rights in the mark; (2) acquired prior to the date of registration; (3) continual use of the mark since that date; and (4) use prior to the registrant on the goods or services that are in issue.'" *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 230-31 (S.D.N.Y. 2022) (quoting *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 311 (S.D.N.Y.

2000)), *aff'd*, No. 23-12-CV, 2024 WL 1152520 (2d Cir. Mar. 18, 2024); *Gen. Petroleum GmbH v. Stanley Oil & Lubricants, Inc.*, No. 2:24-CV-02324-NRM-LGD, 2024 WL 4143535, at *9 (E.D.N.Y. Sept. 11, 2024) ("It is black-letter trademark law that ownership of a trademark is founded upon actual use of the mark in commerce, not mere invention of the mark nor its registration with the USPTO."). "In addition to being the first to use the mark, 'the type of use a [party asserting prior use] must make is one that is sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *City of New York v. Blue Rage, Inc.*, No. 17CV3480JMAAYS, 2021 WL 4480734, at *4 (E.D.N.Y. Sept. 30, 2021) (quoting *Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 573–74 (S.D.N.Y. 2013)).

As explained by the district court in *Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542 (E.D.N.Y. 2017):

> In order to establish "use in commerce" sufficient to overcome the presumption of validity created by the plaintiff's registration of the trademark, however, the defendants must show that they were using the mark in commerce before the plaintiff and that such use was made "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Windows User, Inc., v. Reed Bus. Pub. Ltd.*, 795 F. Supp. 103, 108 (S.D.N.Y. 1992). "To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1271-72. A court must determine whether a trademark has been used in commerce, "on a case by case basis, considering the totality of the circumstances" around the use of the mark. *Chere Amie, Inc. v. Windstar Apparel, Corp.*, No. 01 Civ. 0040, 2002 WL 460065, at *4 (S.D.N.Y. Mar. 26, 2002).

*Id.* at 558; *N. Star IP Holdings, LLC v. Icon Trade Servs., LLC*, No. 22-CV-7324, __ F. Supp. 3d __, 2024 WL 36978, at *14 (S.D.N.Y. Jan. 3, 2024) ("In determining whether the

plaintiffs have satisfied the 'use in commerce' requirement, we ask whether the trademark has been displayed to customers in connection with a commercial transaction." (internal quotation marks and alterations omitted)); *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 105 (E.D.N.Y. 2012) ("Nevertheless, trademark ownership rights go to the first-to-use, not [the] first-to-register." (quotation and citation omitted)).

Here, Defendants have established there are no disputed issues of fact as to each of the required elements for a prior use defense.  First, the undisputed facts establish that the charter agreement approved by the SUNY Board in July of 2014 authorized the School to operate publicly under the Finn Academy name and Plaintiff acknowledges that she "took no steps to stop the school from using the name Finn Academy," thus demonstrating the School's rights in the mark.  (Dkt. 78-2 at 27)  Second, it is undisputed that the School has been openly using the name in commerce since it opened to students in September of 2015, a fact which Plaintiff acknowledged at her deposition was "the first time that Finn Academy began offering educational services to students."  (*Id.* at 31); *see* 15 U.S.C. § 1127 ("The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark."); *Amped & Collection Inc. v. Hinton*, No. 18CIV6094LAKHBP, 2018 WL 5283912, at *5 (S.D.N.Y. Sept. 10, 2018) ("The talismanic test is whether or not the mark was used in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." (quoting *Windows User, Inc. v. Reed Bus. Publ'g*, *Inc.*, 795 F. Supp. 103, 108 (S.D.N.Y. 1992))); *City of New York v. Tavern on the Green*, L.P., 427 B.R. 233, 242 (S.D.N.Y. 2010) ("Courts have held that 'continuing use' requires an

'unbroken continuum of use without significant interruption. . . .'" (quoting *Pilates,* 120 F.Supp.2d at 310-11 (internal quotation marks omitted))).[6]  Similarly, when asked, "[s]o before it opened in 2015 did you ever use the name Finn Academy to provide educational services that were not affiliated in any way with the charter school?" she responded, "[n]o." (*Id.* at 32).  In follow-up questioning as to whether she ever used the name Finn Academy prior to 2015 to operate any business venture at all, Plaintiff only identified the act of writing the curriculum that was proposed with the RFP for the School's charter.  (*Id.* at 32). The Finn Academy mark was not registered by Plaintiff until December 2020, years after the time that the School began operating under that name.  Third, it is undisputed that the School has been operating under the name Finn Academy continually since 2015.  And finally, not only was Defendants' use prior to any use by Plaintiff but there is no evidence that Plaintiff used the mark in commerce at any time.  Indeed, when asked if she has used the name Finn Academy to provide any services in commerce at any time after her termination in 2017, Plaintiff only identified the fact that she represents herself as the founder of Finn Academy and founding Head of School on her resume but concedes that she has not otherwise used the name Finn Academy to provide educational services in commerce.  (*Id.* at 91-92).  She also denied having any document or business plan in writing summarizing a plan to use the name Finn Academy to provide educational services.  (*Id.* at

---

[6]    This was confirmed a second time at Plaintiff's deposition when she was asked "the first time the name Finn Academy was used to provide educational services was when the charter school was operating, right?" and she answered, "To actually provide educational services, yes."  (Dkt. 78-2 at 98).

99).  And she did not take any steps to obtain a trademark until after this litigation was commenced.

To the extent that Plaintiff's claim rests in part on her having conceived the idea for the name or as the author of the curriculum, this does not confer ownership of the mark or constitute priority in use.  *Phoenix Ent. Partners, LLC v. J-V Successors, Inc*., 305 F. Supp. 3d 540, 547 (S.D.N.Y. 2018) (holding that the Lanham Act does not offer protection for the "author of any idea, concept, or communication," as opposed to the producer of a tangible good, because "[a]ny other interpretation would expand trademark law beyond its intended scope and create a species of mutant copyright law." (quotations omitted)); *Buti v. Impressa Perosa, S.R.L*., 935 F. Supp. 458, 468 (S.D.N.Y. 1996) ("Unlike patent law, rights in trademarks are not gained through discovery or invention of the mark, but only through actual usage.  Trademark priority is not automatically granted to the person who was first to conceive of the idea of using a given symbol as a mark. . . . To acquire ownership of a trademark, one must actually use the mark in the sale of goods or services." (quotation and citation omitted)), *aff'd,* 139 F.3d 98 (2d Cir. 1998).

For these reasons, the Court concludes that there is no genuine dispute that Defendants were the first to use the name Finn Academy in commerce and that Plaintiff has not used the mark in commerce.  Accordingly, Defendants have priority over its use and have met their burden to rebut the presumption of trademark's protectability.  For these reasons, Defendants' motion for summary judgment dismissing Plaintiff's trademark infringement claim is granted and Plaintiff's motion is denied.

###### B.    Cancellation of Trademark

Defendants also move for summary judgment on their counterclaims that seek cancellation of the trademark.

Federal courts are empowered to cancel the registration of any registered trademark pursuant to the Lanham Act. *See* 15 U.S.C. § 1119 ("In any action involving a registered mark, the court may determine the right to registration, order the cancellation of registrations, in whole or in part . . . and otherwise rectify the register with respect to the registrations of any party to the action."); *see also Nike, Inc. v. Already, LLC*, 663 F.3d 89, 98 (2d Cir. 2011) ("[D]istrict courts are authorized to cancel registrations, but only . . . in connection with a properly instituted and otherwise jurisdictionally supportable action involving a registered mark." (internal quotation marks omitted)), *aff'd on other grounds*, 568 U.S. 85 (2013).

To justify cancellation, a party "must show that (1) it has standing to bring a cancellation claim, and (2) there are valid grounds for why the registration should not continue to be registered." *Citigroup Inc. v. City Holding Co.*, No. 99-CV-10115, 2003 WL 282202, at *14 (S.D.N.Y. Feb. 10, 2003) (quotation and citation omitted). "A trademark registration can be cancelled '[a]t any time after the 3-year period following the date of registration, if the registered mark has never been used in commerce on or in connection with some or all of the goods or services recited in the registration.'" *zuMedia Inc. v. IMDb.com, Inc.*, No. 23-CV-8472 (VSB), 2024 WL 4566551, at *2 (S.D.N.Y. Oct. 24, 2024) (quoting 15 U.S.C. § 1064(6)).

Here, Defendants contend that summary judgment on their counterclaims for cancellation of the trademark is warranted on grounds of fraud, abandonment, and likelihood of confusion, mistake, or deceit. Because the Court concludes that cancellation is warranted on grounds of abandonment, it need not consider the alternative grounds.

"If a trademark owner 'ceases to use [said] mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been 'abandoned.'" *Lion-Aire*, 747 F. Supp. 3d at 502 (quoting *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007)). "The party asserting abandonment bears the burden of persuasion with respect to two facts: (1) non-use of the mark by the legal owner; and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future." *Id.* (quotation and citation omitted). The statute provides that "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment," and that "'[u]se' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.

The Court concludes that Defendants have met their burden of establishing that Plaintiff has abandoned any use of the Finn Academy mark. Even if there was any credible argument that Plaintiff could be deemed to have used the mark while working at the School, she was terminated from employment in January of 2017. Plaintiff did not even apply for the trademark until over three years later in May of 2020, and she admitted at her deposition that from the period of 2017 to 2020, she did not "at any point draft a written document or business plan of any kind to use the name Finn Academy to provide educational service in

commerce." (Dkt. 79-11 at 219-20).[7] The fact that Plaintiff may have reserved her rights in the mark or intended to use it at some point in the future does not save her claim. *Silverman v. CBS Inc.*, 870 F.2d 40, 47-48 (2d Cir. 1989) ("But challenging infringing uses is not use, and sporadic licensing for essentially non-commercial uses of a mark is not sufficient use to forestall abandonment. . . . Such uses do not sufficiently rekindle the public's identification of the mark with the proprietor, which is the essential condition for trademark protection, nor do they establish an intent to resume commercial use."); *Pado, Inc. v. SG Trademark Holding Co. LLC*, 527 F. Supp. 3d 332, 342 (E.D.N.Y. 2021) ("What constitutes use of a mark depends on the nature of a mark holder's 'occupation or business,' but '[m]inor activities' cannot shield a mark holder from a finding of abandonment." (quoting *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 851 (2d Cir. 1992)). There being no basis to conclude that Plaintiff exercised any use of the mark in commerce, no reasonable jury could find in favor of Plaintiff and Defendants' motion for cancellation of the trademark on the basis of abandonment is granted.

---

[7]    As other examples, when asked if she was "writing any curriculums to use the name Finn Academy," she responded, "[n]ot presently, no." And in response to the follow up question, "[h]ave you since you've been terminated?" she stated, "I have not written a full fledged curriculum." (Dkt. 79-11 at 228-29). She was also asked, "[i]n or around the filing date on May 13, 2020, were you using the name Finn Academy to provide educational services?" and she responded, "[n]ot to provide educational services." (*Id.* at 225). She was then asked, "[w]ere you providing it, or excuse me, were you using the name Finn Academy in commerce on or about May 13, 2020 to provide any type of services?" and Plaintiff stated, "No. My understanding though was that the application I was filing was dated back to its initial princip[al] use." (*Id.*). Similarly, when asked, "[b]eyond personally representing yourself as the founder, have you used the name Finn Academy to provide educational services in commerce," she responded, "I have not. I would have, I would love to, but I have not." (*Id.* at 219).

### C.    Attorneys' Fees

Finally, Defendants request that should the Court grant their motion and cancel Plaintiff's trademark, that they also be permitted to recover their attorneys' fees.

The Lanham Act provides that in "exceptional" cases, a "prevailing" party in a trademark action brought under the act may be awarded its reasonable attorney's fees. *Poly-Am., L.P. v. API Indus., Inc.*, 666 F. Supp. 3d 415, 417 (S.D.N.Y. 2023) (citing 15 U.S.C. § 1117(a)).  "For a case to count as 'exceptional' in this context, it must 'stand[ ] out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'"  *Id.* (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  District courts are permitted broad discretion to determine whether a case is exceptional based upon the totality of the circumstances. *Holiday Park Drive, LLC v. Newist Corp.*, No. 23-CV-2623 (AMD)(JMW), 2024 WL 4802751, at *5 (E.D.N.Y. Nov. 15, 2024).  While fraud, bad faith, or willful infringement are not required in order to establish entitlement to a fee award, the presence of those factors is nonetheless highly relevant to a court's determination.  *Id.*

The Court concludes that the question of whether this case meets the "exceptional" standard justifying the imposition of a fee award has not been adequately developed in the present submissions.  Accordingly, Defendants' motion for attorneys' fees is denied without prejudice to renew.  Any renewed motion for fees shall be supported by legal authority for such relief and describe with some particularity the fees to which they contend they are entitled.  *See Holiday Park Drive, LLC v. Newist Corp.*, No. 23-CV-2623 (AMD)

(JMW), 2024 WL 4040351, at *15 (E.D.N.Y. Feb. 15, 2024) ("In light of the foregoing, it is respectfully recommended that Plaintiff's application for attorneys fees be denied, without prejudice and with leave to renew articulating how this is an 'exceptional' case, and with supporting documentation as to entitlement or amount of fees."); *Blue Rage, Inc*., 2021 WL 4480734, at *9 n.10 ("The City has further requested an award of reasonable attorneys' fees available to the prevailing party 'in exceptional cases.' 15 U.S.C. § 1117(a). Beyond reciting the legal standards, Plaintiff has not provided specific information that would enable a determination of the propriety of or amount such an award.  Accordingly, the request for attorneys' fees is denied without prejudice."); *Sream, Inc. v. W. Vill. Grocery Inc.*, No. 16CV2090CMOTW, 2018 WL 4735706, at *5 (S.D.N.Y. Oct. 1, 2018) (denying request for fees pursuant to 15 U.S.C. § 1117(a) without prejudice where plaintiff's "submissions do not provide appropriate support for such an award").

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted as to Plaintiff's claims for First Amendment retaliation pursuant to 42 U.S.C. § 1983, stigma-plus due process pursuant to § 1983, and trademark infringement, but it is denied as to Plaintiff's claims for violation of due process arising from a property interest in continued employment pursuant to § 1983.  The portion of Defendants' motion seeking summary judgment on its counterclaims and cancellation of Plaintiff's trademark registration No. 6,215,563 is granted.  Defendants' request for fees is denied without prejudice to renew. Plaintiff's motion for partial summary judgment is denied in its entirety.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:       March 17, 2025
             Rochester, New York